IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                         |   |                              |
|-------------------------|---|------------------------------|
|                         | : |                              |
| STEPHANIE MOHR          |   |                              |
|                         | : |                              |
|                         |   |                              |
| v.                      | : | Civil Action No. DKC 2003-2893 |
|                         |   | Criminal Case No. DKC 2000-0453 |
|                         | : |                              |
| UNITED STATES OF AMERICA |   |                              |
|                         | : |                              |

**MEMORANDUM OPINION**

Presently pending and ready for resolution are (1) Petitioner's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence (paper 160); and (2) Petitioner's motion to amend/correct her § 2255 motion (paper 168).  For the reasons that follow, the court will deny both motions.[1]

**I.   Background**

The following recitation of the evidence is found in the decision of the Court of Appeals affirming Petitioner's conviction:

> On September 21, 1995, Officer Wendell Brantley, of the Takoma Park, Maryland Police Department, was conducting surveillance in the Holton Lane area of Prince George's County because of a number of commercial burglaries in that area.  At approximately 2 a.m., Officer Brantley spotted two men on the roof of the Sligo Press building. He called for assistance and several Takoma Park officers, including Sergeant Dennis Bonn, responded. Bonn then asked for assistance from Prince George's County and specifically requested a K-9 dog. Prince George's K-9 officers Mohr and Anthony Delozier arrived with Mohr's police dog. Bonn also called for a Maryland State Police helicopter, which illuminated the entire roof with a powerful light called a "night sun."

---

[1] The filing of this Memorandum Opinion moots the Motion to Disgorge Memorandum Opinion.

Bonn, with corroboration from three other police eyewitnesses, testified to the government's version of how and why Mohr released her police dog on Ricardo Mendez, one of the suspects on the roof. After the helicopter arrived, the officers ordered the suspects to come to the back of the roof. Mendez and the other suspect, Jorge Herrera Cruz, did so and held their hands in the air, as directed by the officers. Then, again as directed by the officers, the suspects climbed down from the roof, keeping their hands in the air, and eventually facing the officers, who surrounded them in a semicircle, some with their guns drawn. Bonn testified that the suspects followed all police commands.

As the suspects stood with their hands up in the air, Delozier approached Bonn and asked: "Sarge, can the dog get a bite?" Bonn "responded with one word, which was yes." Bonn testified that "[a]t that time, [the suspects] still had their hands in the air and they weren't doing anything." Bonn then witnessed Delozier and Mohr have "a very, very brief exchange," followed by Mohr releasing the dog. The dog attacked Mendez, who "still had his hands in the air when ... the dog bit him in the leg. [He] went down screaming and continued to scream." Bonn testified that, prior to Mohr's release of the dog, Mendez did not make "any sudden movement," did not "fail to comply with police command[s]," did not "lower his hands," and did not "attempt to flee in any way." Bonn did not hear any K-9 warning prior to Mohr's release of the dog or at any point during the evening.'[2]  As a result of the incident, Bonn pled guilty as an accessory-after-the-fact to a civil rights violation and testified for the government pursuant to a plea agreement.

Mohr took the stand and offered a very different version of the events. She testified that she gave a K-9 warning while Mendez and Herrera-Cruz were on the roof. Mohr further testified that Mendez did not follow her orders to stop when he climbed down from the roof, and that he did not raise his hands: "Mr. Mendez's hands never went up. He had them in the front of his body, around his waistband area. Sometimes I could see his hands and sometimes they went out of my sight in front of his body. There [were] times that I couldn't see his hands, and I was ordering him-I was issuing him command after command to raise his hands, and he didn't." Mohr did not believe that either suspect had been frisked. She

2

then observed Mendez "turn his body and his feet to the left and make a movement to the left, [and] as soon as [she] saw him do that, it meant to [her] that he was going to run to the left" and "attempt to flee" toward an avenue of escape where she believed there were no officers. Mohr explained that she did not have time to give her usual K-9 warning but yelled to Mendez to stop. She then released the dog. Mohr testified that Delozier did not speak to her prior to releasing the dog and that she alone made the decision to do so. Mohr acknowledges that Mendez suffered "at least one serious dog bite."

It was subsequently discovered that Mendez and Herrera-Cruz were homeless and were simply sleeping on the roof. The parties stipulated that the Takoma Park Police Department charged both men with burglary in the fourth degree. Charges against Mendez were subsequently dismissed. Herrera-Cruz was jailed for 60 days, appeared in court without an attorney and pled guilty; he was sentenced to time served.

---

[2] A K-9 warning is a "loud verbal" announcement made prior to release of the dog, which allows "innocent persons to exit the area and afford[s] suspects an opportunity to surrender." *Vathekan v. Prince George's County*, 154 F.3d 173, 176 (4th Cir.1998).

*United States v. Mohr*,  318 F.3d 613, 616-617 (4th Cir. 2003).

In September 2000, a federal grand jury returned an indictment charging Petitioner and others with violating 18 U.S.C. § 242, by acting under color of law to willfully deprive Mr. Mendez of his right to be free from the use of unreasonable force, and conspiracy, in violation of 18 U.S.C. § 371.

A jury trial was held from February 26 to March 14, 2001.  The jury acquitted Petitioner of conspiracy and Delozier of the § 242 offense, but could not reach a verdict on the § 242 charge against Petitioner or the conspiracy charge against Delozier.  The court

declared a mistrial on these two counts.  A second trial commenced on July 31, 2001.  This time, the jury returned a guilty verdict against Petitioner on the § 242 charge and acquitted Delozier on the conspiracy charge.  Petitioner was sentenced to 120 months imprisonment.

Petitioner appealed to the United States Court of Appeals for the Fourth Circuit, challenging several evidentiary rulings and claiming ineffective assistance of counsel.  *Mohr*, 318 F.3d at 616. The Fourth Circuit affirmed the judgment and declined to consider the ineffective assistance claim, noting that it would be more properly raised through a motion under 28 U.S.C. § 2255.

Petitioner filed this § 2255 motion to vacate on October 10, 2003, and moved to supplement her motion on July 29, 2004, to assert a claim pursuant to *Blakely v. Washington*, 542 U.S. 296 (June 28, 2004).  In a letter to the court dated January 15, 2007, Petitioner, via counsel, conceded that she is entitled to no relief under the *Blakely/Booker* doctrine.  The court will, therefore, deny as futile her motion to supplement (paper 169).

This court held an evidentiary hearing on August 5, 2004, and heard evidence concerning Petitioner's claim for ineffective assistance of counsel.  At all pre-trial hearings and during the two jury trials, Petitioner was represented by David M. Simpson. During the appeals process and in the filing of the § 2255 motion and at the evidentiary hearing, Petitioner was represented by Fred

4

Warren Bennett.   At this time, Rachel Marblestone Kamins is representing Petitioner.

## II.  Issues

Petitioner asserts two grounds for relief (1) ineffective assistance of counsel and (2) cumulative error.

Under the rubric of ineffective assistance of counsel, Petitioner faults Mr. Simpson for (i) failing to file timely a motion to dismiss the indictment, (ii) failing to object to the testimony of Jocilyn Hairston, (iii) improperly cross-examining Mr. Bonn, (iv) failing to investigate and present testimony from available character witnesses, and (v) failing to object to a specific statement by Mr. Bonn.

## III. Standard of Review

Title 28 U.S.C. § 2255 requires a petitioner asserting constitutional error to prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law."   On the other hand, "[t]he scope of review of non-constitutional error is more limited than that of constitutional error; a nonconstitutional error does not provide a basis for collateral attack unless it involves 'a fundamental defect which inherently results in a complete miscarriage of justice,' or is 'inconsistent with the rudimentary

demands of fair procedure.'" *United States v. Mikalajunas*, 186 F.3d 490, 495-96 (4th Cir. 1999) (internal citation omitted).

## IV.   Ineffective Assistance of Counsel

The standards governing constitutionally ineffective assistance of counsel claims are well settled under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prevail on a claim of ineffective assistance of counsel, Petitioner must show that her attorney's performance fell below an objective standard of reasonableness and that she suffered actual prejudice.  *See Strickland,* 466 U.S. at 687.  To demonstrate actual prejudice, she must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  According to *Strickland*, there exists a strong presumption that counsel's conduct was within a wide range of reasonably professional conduct, and the courts must be highly deferential in scrutinizing counsel's performance.  *See id.* at 688-89; *Bunch v. Thompson*, 949 F.2d 1354 (4th Cir. 1991), *cert. denied*, 505 U.S. 1230 (1992).  Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted even had the attorney been deficient.  *See Strickland*, 466 U.S. at 697.

## A.  Failing to File Timely a Motion to Dismiss the Indictment

Petitioner argues that Mr. Simpson erred because he failed to file timely a motion to dismiss the indictment against her on the

ground that the exclusion of police officers from federal grand and petit juries is unconstitutional.  This deficiency was prejudicial, argues Petitioner, because had the motion to dismiss the indictment been filed timely it would have been granted by the court; thus, the indictment would have been dismissed and further prosecution of Petitioner would have been barred by the statute of limitations.

The 1968 Jury Selection and Service Act, 28 U.S.C. § 1863 (b)(6), requires each United States District Court to bar from jury service:

> members of the fire or police departments of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession . . . public officers in the executive, legislative, or judicial branches of the Government of the United States, or of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession, who are actively engaged in the performance of official duties.

The Fourth Circuit has not addressed the constitutionality of the exemptions under 28 U.S.C. § 1863(b)(6).  The only two circuits that have considered this question have both found the exemptions constitutional.  *See United States v. Henderson*, 409 F.3d 1293, 1305-06 (11th Cir. 2005); *United States v. Terry*, 60 F.3d 1541, 1544 (11th Cir. 1995); *Government of the Canal Zone v. Scott*, 502 F.2d 566, 568-69 (5th Cir. 1974).  In explaining its rationale, *Scott* cites two cases from the United States Supreme Court:

> The mere exclusion of certain occupational classes for reasonable purposes is not constitutionally infirm.

7

> Justice Holmes stated the appropriate standard in *Rawlins v. Georgia*, 1906, 201 U.S. 638, 640, 26 S.Ct. 560, 561, 50 L.Ed. 899 (1906): certain occupations may be categorically excluded from jury duty on the 'bona fide ground that it (is) for the good of the community that their regular work should not be interrupted'. In *Peters v. Kiff*, 1972, 407 U.S. 493, 500, n. 10, 92 S.Ct. 2163, 33 L.Ed.2d 83 [(1972)], the Supreme Court noted the continuing vitality of this standard as a qualification on the 'fair cross-section' principle.

*Scott*, 502 F.2d at 569.

To establish ineffective assistance of counsel, Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The United States Supreme Court has held that the exclusion of certain occupational classes from jury service may be constitutional and the Fourth Circuit is silent on whether the exclusion of police officers from jury service is constitutional. The only two courts of appeal to consider this question have held that the exemptions are constitutional. In light of the case law, Petitioner has not shown there is a reasonable probability that the court would have granted a motion to dismiss the indictment based on the unconstitutionality of the § 1863(b)(6) exemptions, even had it been filed timely. Thus, Petitioner cannot show actual prejudice from Mr. Simpson's allegedly deficient performance.

Moreover, it is not error for an attorney not to pursue a motion that has not succeeded anywhere. It is not even error to fail to anticipate a new rule of law. *See, e.g., United States v.*

*McNamara*, 74 F.3d 514, 516 (4th Cir. 1996)("[A]n attorney's failure to anticipate a new rule of law was not constitutionally deficient", *citing Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995)). The only authority at the time of Petitioner's trial, and today, upholds the exclusion of jurors challenged here. Mr. Simpson did raise the issue, albeit untimely. He need not have raised it at all.

## B. Testimony of Jocilyn Hairston

The Government presented the testimony of Jocilyn Hairston as Fed.R.Evid. 404(b) evidence. Rule 404(b) permits evidence of "other bad acts" to come in for the purpose of showing motive, intent, or in this case, absence of mistake or accident. Fed.R.Evid. 404(b). Ms. Hairston testified that in July 1998, several officers knocked on her door, late at night, looking for her brother who was wanted for violating his probation. While two officers were searching her home, she stood at the front door with a female K-9 officer. Ms. Hairston testified that the female K-9 officer threatened that she would release the dog to bite Ms. Hairston's "black ass" if the other officers found her brother hiding in her home. (Trial Tr., Aug. 2, 2001, at 169).

Petitioner claims Mr. Simpson erred because he failed to object immediately following Ms. Hairston's testimony on the ground that she had not identified Petitioner as the female K-9 officer. Mr. Simpson did object to Ms. Hairston's testimony for this reason,

but he did so after the conclusion of cross-examination and once another witness had already taken the stand.  In a conference with counsel at the bench, the court stated in response to Mr. Simpson's motion, "had the motion to strike been made at the end of direct testimony . . . I would have granted it because there was at that time no evidence linking the event we had just heard about to Stephanie Mohr because it was only in reference to a female K-9 officer." (Trial Tr., Aug. 2, 2001, at 220).  The court went on to say that the cross examination supplied "sufficient identifying testimony that the jury can find, not that they must, but that they can find that it is her." (*Id.* at 220-21).  Petitioner claims that this alleged error was especially prejudicial because the witness had an emotional outburst during cross-examination that could have been avoided had counsel objected timely.

Under the *Strickland* analysis, the question is whether Mr. Simpson's delay in objecting to Ms. Hairston's testimony fell below an objective standard of reasonableness, and if it did, whether the direct testimony and the cross-examination, which elicited identifying information and the witness's emotional outburst, caused actual prejudice to Petitioner.

Mr. Simpson testified that prior to the second trial he was fully aware of the nature of Ms. Hairston's testimony and that the Government intended to offer the testimony of Ms. Hairston's mother to corroborate her testimony and to identify Petitioner as the

10

female K-9 officer.  (Paper 164, Simpson Aff., ¶ 7).  Mr. Simpson,
aware that his client would be positively identified by a
subsequent witness, clearly made a tactical decision to try to
highlight the weaknesses of Ms. Hairston's testimony through cross-
examination, rather than object to the direct testimony on the
ground that she had not identified Petitioner.[2]  A strategic
decision of trial counsel "must be directly assessed for
reasonableness in all the circumstances, applying a heavy measure
of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691;
*see also Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) (same).
An attorney's tactical decisions are entitled to deference and
should not be second guessed, *see Goodson v. United States*, 564
F.2d 1071, 1072 (4th Cir. 1977), unless it appears the attorney's
performance was unreasonable under the circumstances, *Strickland*,
466 U.S. at 690.  Mr. Simpson's decision not to object immediately
following Ms. Hairston's direct testimony was objectively
reasonable and fell within "the wide range of reasonable
professional assistance."  *Strickland*, 466 U.S. at 689.

The fact that Mr. Simpson objected to Ms. Hairston's testimony
after cross-examination had been completed does not bear on whether

---

[2]  It is also likely that, had Mr. Simpson objected
immediately, the Government would have proffered the additional
testimony of a subsequent identifying witness and the court could
well have deferred ruling on the objection.  Conditional admission
of evidence, subject to later completion of the foundation, is not
at all unusual.

it was error for him not to object at the close of her direct
testimony.  The court is "obligated by law to make 'every effort to
avoid the distorting effects of hindsight.'"  *United States v.*
*Roane*, 378 F.3d 382, 410-11 (4th Cir. 2004) (quoting *Strickland*, 466
U.S. at 689).  Counsel's performance must be evaluated "from
counsel's perspective at the time of the alleged error and in light
of all the circumstances. . . ."  *Kimmelman v. Morrison*, 477 U.S.
365, 381 (1986).

Counsel did not object at the close of direct testimony
because he thought it would be better to highlight the weaknesses
of the witness's testimony.  After he finished cross-examination,
however, it was counsel's professional opinion that Ms. Hairston
had not established that it was his client who was present on the
night in question.  Counsel explained his objection to the court:

> Unless the Government is going to offer other witnesses
> on this issue, I don't believe the Government has even
> established that it was my client that was there that
> night.  There are -- there is an issue at this point that
> she could not identify her in court when the question was
> asked.  She described her as a small woman, and I would
> note for the record, and the Court can make its own
> observation here, that Stephanie Mohr is not a small
> woman.

(Trial Tr., Aug. 2, 2001, at 216-17).  Counsel based his objection,
in part, on the witness's answers to his questions during cross-
examination.  It was objectively reasonable for counsel to object
to Ms. Hairston's testimony after cross-examination rather than
immediately after direct examination.  Because Mr. Simpson

committed no error, the court need not decide whether Petitioner suffered actual prejudice as a result of Mr. Simpson's decision. As noted in footnote 2, moreover, given the availability of the other identifying witness, the Government would have proffered the eventual foundation and the testimony would not have been stricken.

## C.  Testimony of Mr. Bonn

### 1. Evidence of the Polygraph Incident

Petitioner claims Mr. Simpson erred because he embarked on a particular line of questioning with Mr. Bonn that opened the door for the Government to introduce evidence that, when faced with the prospect of taking a polygraph test, Mr. Bonn changed his version of the events to the one he recounted at trial.  Petitioner argues that this error was prejudicial because it lent extra credence to the version of events Mr. Bonn ultimately told the jury.

Mr. Simpson testified that he made a tactical decision to cross-examine Mr. Bonn about the polygraph incident and "was completely familiar with the factual circumstances of Bonn's planned polygraph examination, and . . . was fully aware of the potential risk involved should such evidence be introduced." (Paper 164, Simpson Aff., ¶ 9).  Counsel chose to pursue this strategy because he "believed that it was more important to attack the credibility of Bonn and to question his motivation for admitting his involvement, given that Bonn was a central witness in the government's case."  (*Id.*).

13

"In *Strickland*, the Court recognized that strategic choices by counsel made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Burch v. Corcoran*, 273 F.3d 577, 589 (4th Cir. 2001)(internal quotation marks and alterations omitted) (quoting *Strickland*, 466 U.S. at 690).  In pretrial briefings, the Government informed the court and opposing counsel that it would seek to introduce evidence of a planned polygraph exam to rehabilitate Mr. Bonn as a witness if evidence of his prior inconsistent statement was introduced.  Mr. Simpson testified that he was fully aware of the Government's intent to do this, but chose to attack Mr. Bonn's credibility anyway because he was such a crucial witness.  The record shows that Mr. Simpson vigorously cross-examined Mr. Bonn and repeatedly attacked his credibility. (See Trial Tr., Aug. 7, 2001, at 72 *seq.*).  Part of Mr. Simpson's strategy was to emphasize that it was the Government's ultimate decision not to administer the polygraph, and that it did not administer it because it did not want to run the risk of Mr. Bonn failing that test.  (Paper 164, Simpson Aff., ¶ 10).  Mr. Simpson made this argument to the jury at closing.  (See Trial Tr., Aug. 14, 2001, at 55-56).

The decision to attack Mr. Bonn's credibility, even though it allowed evidence of a planned polygraph test to come in, was a reasonable tactical decision made by Mr. Simpson and does not constitute error under *Strickland*.

## 2.  Failure to Object to Statement

During re-direct examination, Mr. Bonn testified that at the time the dog was released, the suspects were on the ground with their hands in the air.  (Trial Tr., Aug. 8, 2001, at 207).  The Government then asked why the fact that the suspects' hands were in the air was significant.  (*Id.*).  Mr. Bonn replied: "Because that tells everybody whether it's a good release or not for the dog.  If they're not resisting, they're not doing anything, then it's excessive use of force. . . ." (*Id.*).  Petitioner claims that Mr. Simpson was ineffective for failing to object to, and not moving to strike, Mr. Bonn's statement that the release of the dog was excessive use of force.  (Paper 160, at 24-25).  Petitioner claims that if Mr. Simpson had objected to the testimony and had moved to have it struck, the court would have sustained the objection because the testimony was beyond the scope of the question or it was inadmissible under Fed.R.Evid. 701 and 704(a).[3]

---

[3]  Fed.R.Evid. 701 provides:

Opinion Testimony by Lay Witnesses - If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

(continued...)

Mr. Simpson's failure to object to Bonn's reference to "excessive use of force" did not fall below an objective standard of reasonableness. Mr. Bonn testified as a lay witness, and under the federal rules, it is sometimes permissible for lay witnesses to offer their opinions on an ultimate issue of the case if based on personal knowledge. *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006). Mr. Simpson stated that because Mr. Bonn offered that answer "in response to a series of questions regarding the factual circumstances of the incident, and not as an expert opinion" he did not believe it was necessary to object to the statement. (Paper 164, Simpson Aff., ¶ 11). Furthermore, the statement came after Mr. Simpson had spent a significant amount of time impeaching Mr. Bonn's credibility and Mr. Simpson intended to present expert witness testimony on the use of reasonable force.

---

[3](...continued)

       Fed.R.Evid. 704 provides:
       Opinion on Ultimate Issue - (a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. (b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

(*Id*.).   Mr. Simpson's failure to object to this statement was within the wide range of reasonable professional assistance.

Even if Mr. Simpson did commit error by not objecting, Petitioner has failed to show actual prejudice as a result.   The court instructed the jury as to the seven-prong test it should use to determine what "reasonable force" meant.   (Trial Tr., Aug. 13, 2001, at 578).   The court specifically cautioned the jury that although some witnesses had expressed an opinion as to the reasonableness of force used, the court's definition and their own factual determinations controlled.   (*Id*. at 577).   Thus, Petitioner has failed to show that Mr. Simpson erred or that she suffered actual prejudice as a result of his failure to object to Mr. Bonn's statement about excessive force.

## D.   Character Witnesses

Petitioner claims Mr. Simpson provided ineffective assistance of counsel because he did not interview or call any character witnesses on her behalf.   She states that this error prejudiced her trial because her co-defendant called seven strong character witnesses, and the juxtaposition of his witnesses to her lack of witnesses resulted in his acquittal and her conviction.

At the evidentiary hearing held on August 5, 2004, Mr. Simpson testified about his representation of Petitioner.[4]   Mr. Simpson,

---

[4] The facts stated in this subsection were presented at the August 5, 2004, evidentiary hearing, unless otherwise noted.

17

with twenty-five years of experience as a trial lawyer, represented Petitioner at both trials.  He had been a prosecutor for 6 years; the remainder of his criminal trial experience was as a defense attorney.

Mr. Simpson met with his client to discuss trial strategy on many occasions.  The meetings, at times, included other people, such as William C. Brennan, counsel for co-defendant Mr. Delozier, and Adam Popielarcheck, Petitioner's fiancé.  In preparation for the trial, Petitioner provided Mr. Simpson with a resume and a list of names of potential character witnesses.  Petitioner told Mr. Simpson what each witness would say and as to which character trait, honesty or truthfulness.  Petitioner admits that she "followed Mr. Simpson's advice and did not urge him to call any character witnesses." (Paper 166, Mohr Decl. ¶ 5).  Mr. Simpson did not personally interview the witnesses because he did not plan to call them, and he knew the substance of their proposed testimony from Petitioner.  Mr. Simpson agreed that without interviews, he could not know how strong each witness would be.  Nevertheless, Mr. Simpson's overall strategy to attack the Government's case and to keep away from character evidence was reasonable under the circumstances.

The Government informed Mr. Simpson pretrial that it would seek to introduce Rule 404(b) evidence of Petitioner's other bad acts.  Mr. Simpson made a tactical decision that his central trial

strategy would be to attack the Government's theory as absurd and to avoid character evidence.  Mr. Simpson wanted to minimize the impact of Petitioner's other bad acts, so he decided the best strategy was to keep Petitioner out of the limelight.  Mr. Simpson was not concerned that counsel for Mr. Delozier planned to call character witnesses, and he did not, because Mr. Delozier was not the subject of Rule 404(b) evidence as was Petitioner.  When asked why he did not call police officers as character witnesses, Mr. Simpson replied that because the Prince George's County Police Department was effectively on trial, he believed it would not be helpful to have other police officers testify that Petitioner was a good person.

While Mr. Simpson knew that Petitioner had to testify, thus opening the door to evidence of her character for truthfulness, he felt that the less she appeared in the spotlight, the better.  Mr. Simpson was concerned with the other bad acts that could come out during cross-examination of any character witnesses he presented.  Although some of the incidents regarding Petitioner's character for truthfulness came out because Petitioner testified, Mr. Simpson did not believe that reemphasizing these incidents through additional character testimony would be helpful to Petitioner's case.  Mr. Simpson explained that he did not move in limine to restrict the scope of cross examination of any character witnesses because he already knew what the Government would ask about.  The Government

had evidence of two or three incidents concerning peacefulness, and at least one (or more) on truth.  For Petitioner's character on truth and veracity, the Government only cross-examined Petitioner about one incident that involved an alleged false statement she made concerning training.  Mr. Simpson knew of other potential incidents that could come out on her character for truthfulness, including exaggerating shooting scores, bomb dog call outs, lying to superiors in September 1998, and the dumpster incident.[5]  He also knew that the Government was still investigating and interviewing people between the two trials and could potentially discover more bad acts.  As to Petitioner's character for peacefulness, he knew of seven alleged other bad acts that might be used during cross examination.  Because of the numerous other bad acts that could potentially come in during cross examination, Mr. Simpson's tactical decision not to present character witnesses was reasonable.

---

[5]   Mr. Simpson was aware of a Prince George's County police internal affairs investigation that determined that Petitioner lied during an investigation of another case where Petitioner allegedly released a dog on a victim unnecessarily.  He knew this evidence was not a matter of general knowledge in the community and could not have come in through other character witnesses. *See generally United States v. Curry*, 512 F.2d 1299, 1304 (4th Cir. 1975) ("witness called by the prosecution to rebut the defendant's evidence of his good reputation can only testify as to the consensus of opinion about the defendant which he has heard circulating in the relevant community concerning the defendant.").

> "[W]hether or not to call a character witness is eminently a tactical decisions (sic) that another court is not in a good position to second-guess. Absent an extraordinary showing by the petitioner, such a claim will not merit a finding that trial counsel performed below the constitutional minimum." *Jelinek v. Costello*, 247 F.Supp.2d 212, 289 (E.D.N.Y. 2003). The Supreme Court has, in fact, found more limited investigations into a defendant's background to be justified where any evidence presented would have a "double edge." *Carter v. Mitchell*, 443 F.3d 517, 532 (6th Cir. 2006); *cert. den*. --- U.S. ----, 127 S.Ct. 955, 166 L.Ed.2d 730 (2007) (*citing Wiggins v. Smith*, 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).

*Shears v. Caruso*, 2007 WL 1582151,*3 (E.D. Mich. 2007). An attorney's tactical decisions are entitled to deference and should not be second guessed, *see Goodson*, 564 F.2d at 1072, unless it appears the attorney's performance was unreasonable under the circumstances, *Strickland*, 466 U.S. at 690. Based on the record and the evidence presented at the hearing, it is clear Mr. Simpson made a reasonable tactical decision, after careful deliberation, not to call character witnesses.

Moreover, Petitioner has not met her significant burden to show actual prejudice. At the first trial, Petitioner had not called character witnesses, even though Mr. Delozier did, and the jury acquitted each defendant on one count and was unable to reach verdicts on the other. Thus, the mere juxtaposition of some character witnesses for her co-defendant and none for her was not unfairly prejudicial.

## VI. Cumulative Error

Petitioner claims that the cumulative effect of the errors enumerated denied Petitioner due process and a new trial is required.   An unpublished Fourth Circuit opinion explains the cumulative error analysis in this circuit:

> As to several of the claims, the district court found that, assuming that counsel's performance was deficient, based on Russell's offense level, the sentence would be the same; therefore he could not show prejudice as required to prove ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   In addressing Russell's claim that the errors, viewed together, resulted in prejudice, the district court held that cumulative errors are not recognized in the Fourth Circuit.   The court cited *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998), for this proposition.   In *Fisher*, we held that it is not appropriate to consider the cumulative effect of attorney error when the individual claims of ineffective assistance do not violate the defendant's constitutional rights.   *Id.* at 852-53.
>
> The individual claims in *Fisher* were reviewed on the merits and determined not to amount to error.   Thus, cumulatively, we held they could not amount to error. *Id.; see Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998) (stating that cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors). However, in this case, the district court did not review the individual claims of error on the merits. Rather, the court held that, even if there were error, there was no prejudice to Russell. We find that *Fisher* is not controlling here.

*United States v. Russell*, 34 F.App'x. 927, 927-28 (4th Cir. 2002).

In this case, Petitioner states five grounds for ineffective assistance of counsel.   In the preceding discussion, this court

specifically found there was no attorney error.   *Fisher* thus applies, and there can be no cumulative error.

## VII. Conclusion

For the foregoing reasons, the court will deny all motions. A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge